Good afternoon, my name is Robert Young, appearing on behalf of the appellant, Mark Gesse. I have a few remarks to make with respect to that. I would like to reserve maybe five minutes for rebuttal. Sure. Just keep an eye on the clock if you would. Pardon me? Keep an eye on the clock if you would. I will. Thank you. After reviewing all the evidence, I believe that the evidence that was presented to the trial court and considered by the Court of Appeal was insufficient to support the conviction of Mr. Gesse for second-degree murder. Mr. Young, please go a little bit slower and keep in mind that that microphone before you probably does not amplify your voice. So if you wish to be heard and understood, speak up a little. Okay. With respect to the matter of the sufficiency of the evidence, the law is clear under Hurtado v. Tucker that the Court of Appeal had an obligation to review and consider each of the key arguments made by Mr. Gesse in defense of the charges made against him by the prosecution. In the guidelines established by Hurtado, one of the matters was that they were supposed to consider every key argument. Now, Mr. Gesse raised several affirmative defenses to the charges. He raised provocation as heat of passion, sudden quarrel. And he also raised unreasonable but good-faith belief in self-defense. He raised those arguments in defense of the charges. And the Court of Appeal did not consider either of those affirmative defenses. And under Hurtado, that failure and absence of consideration by the Court of Appeal could be considered as objectively unreasonable. So it's not a sufficiency of the evidence question. Yes. It's supposed to be considered on a sufficiency of evidence standard under Jackson and under Hurtado. That's how that issue arises. So they had this. Could I ask you a question, please? Yes. Let's see if we're both on the same page. This is an appeal from a denial of habeas. That's right. Under 2254, we look to the last reasoned decision of the State court. That's what I'm talking about. On the issue of sufficiency of the evidence. That's correct. I was unable to find any discussion by the District Court of Appeal in the year 2003 on the appeal from denial of the writ of habeas corpus in the trial court, the California trial court. The only discussion I could find of the sufficiency of the evidence in a last reasoned decision by a State court was in the 2001 direct appeal. Is that the one to which you are going to make reference on the issue of sufficiency of the evidence under Jackson? No. We're looking at the Court of Appeal's decision denying the writ of habeas corpus. I don't see any discussion at all of the sufficiency of the evidence in that case. As a matter of fact, I looked at it just now, and it's a page five. The last page four and five, it says that finally, I guess he contends he was prosecuted because he is a gay man, pointing to an internal memorandum. But I don't see any discussion in that case regarding the sufficiency of the evidence. Actually, on page nine, starting on page 19 of the Court of Appeal's decision, it's contained in the appellate. There are only five pages in the Court of Appeal's decision. What's the date of the opinion you're talking about, Mr. Young? The date of the opinion is the September 13, 2001. Oh, that's the appeal. That's the direct appeal, isn't it? That's right. So that's the one you're talking about. That's right. And you start talking, the sufficiency of the evidence is the discussion starts at page 16 of that supplemental excerpt of record 16, right? That's right, 16. So we're on the same page. Okay, yes. I'm sorry. I just misunderstood. Okay. So in that opinion, neither of the affirmative defenses that I spoke of were addressed by that Court of Appeal's decision. Now, and under Hurtado, that can be considered an objectively unreasonable omission by the Court of Appeal and allow the Ninth Circuit to reverse and find evidence that's sufficient with respect to those matters under Hurtado. Then, also, I believe But there was a very detailed discussion by the Court on the direct appeal of all the circumstances leading up to Mr. Tower's death. And if they didn't discuss heat of passion or self-defense, that could well be because there wasn't any evidence of that. Well, actually, there was evidence of heat of passion, because the evidence starts out with Mr. Tower's initial assault and attack on Mr. Gessie when he was in the boat and forced him off out into the water. That right there is an example of evidence showing that there was a quarrel, a fight, heat of passion, that anyone would be upset if someone did that. Are you referring to Mr. Gessie's testimony at his first trial? That's correct. All right. That's never been rebutted as far as Mr. Tower attacking him and forcing him in the water. They actually both fell in the water at that time. And then they had arguments thereafter. But, I mean, that alone is enough to establish heat of passion, sudden quarrel, provocation sufficient to establish a defense of self-defense. And the Court of Appeal never even discussed that. Never discussed that. He never testified to it in the second trial. Well, that issue was raised in the first trial. His testimony, Mr. Gessie's testimony was read into the record of the second trial, so that was part of the record in the second trial as well. So he never had a sense to tell the jury himself? Not the second jury, other than through the testimony of his first ‑‑ the first testimony in the first trial, I believe, was read into the record in the second trial. So ‑‑ and it would have come in at that point. But the Court of Appeal, on the other hand, even though that was raised, instructions were given regarding self-defense and regarding provocation. Jury instructions were given to the jury. And ‑‑ but the Court of Appeal never considered whether or not the evidence was sufficient or insufficient or whether the prosecution proved beyond a reasonable doubt, as they must, that those defenses were not valid, could not be found. They have to show that, and they didn't show that. The Court of Appeal didn't even discuss it. Suppose you're right, that there's insufficient evidence of second-degree murder. What do we do with the lesser-included offenses that they didn't reach? Does he get a new trial on manslaughter? He would, except I think he's now served more time than he could have been given for manslaughter. I think it's six years or something. I think he's already ‑‑ he's been in there over ten years. But I think that technically that's what would happen. And with respect to other findings of the Court of Appeal, which I believe are both flawed and also objectively unreasonable, which is the standard of the Ninth Circuit, defining that Mr. Gessie was ‑‑ that Mr. Tower was sexually assaulted by Mr. Gessie, the Court of Appeal basically adopted that position that was asserted by the prosecution in the trial court. But if you go back and consider the acquittal in the first trial, Mr. Gessie was acquitted of first-degree murder. An essential element of that acquittal was a sexual assault. In other words, an essential element of that charge was essentially a sexual assault. It was a first-degree murder charge under the felony murder rule. And the basis of that felony in the death penalty, first-degree murder charge, was that Mr. Gessie had sexually assaulted Mr. Tower. But the finding of the first jury that he did not basically disposes of that issue. And I just recently came to my attention a case called Yeager v. United States. It's 557 U.S. blank, 2009. It was decided, handed down, I mean, in June of this year, 2009. It just came to my attention a few days ago. And that court holds that if some ‑‑ if some counts the court, the jury acquits and there's some counts that are hung, the prosecution cannot proceed on those hung counts if one of the elements of the hung counts was decided by the jury that acquitted him on the first count that was acquitted on. You can't do that. And that's what Yeager says. And it's a clarification of the law that was first handed down under Ash v. Swenson in 1970 by the U.S. Supreme Court. So I think that case would hold, that Yeager case would hold, that the prosecution could not have argued and the court of appeal could not have made any findings with respect to the sexual assault by Gessie on Tower. And that's important because that assault, the so‑called sexual assault, which we believe never happened, that there was no direct evidence of it, that was important in persuading the court of appeal to make a second finding that Mr. Tower had voluntarily ‑‑ had involuntarily jumped off the boat into the water, whereas Mr. Gessie testified he jumped off voluntarily. So I think that's very important. You said you wanted to reserve five minutes, and I see that's where you are. Am I? Yeah. Just give me one more point. Sure. One more. The court ‑‑ yeah, that's right. Also, the court of appeal made a finding that Mr. Tower could not have jumped off the boat because he should have known better, was drunk. He was so drunk he should have known better not to jump off. Well, I maintain, I put forth in the papers that if someone's drunk, they do foolish things and self‑destructive things. And that's the very reason that he would have jumped off. So I don't think that's a very good argument. I think it's objectively unreasonable. And one last point I want to make is that the court of appeal made a presentation of the law on page 18 of its decision that the prosecution need not eliminate all inferences to show noncriminal cause of harm. It is sufficient to introduce evidence which creates a reasonable inference that harm ‑‑ We know how drunk he was. Oh. Okay. We know how drunk Mr. Tower was. Yes. Okay. This is a different issue. What? No, no. He's asking you do you know how drunk he was. Oh, yeah, .16. What? .16 blood count. .16. Now, that, though, is a little deceiving. Didn't they say that it could be ten points of that attributable to the decomposition of the body? Could be. Maybe it is. Maybe it's not. We don't know. We know he drank. Right. Ten cans of beer. We also know before that ‑‑ How many cans did he drink? I guess he had two. Tower had ten. And how many did Mr. Gates drink? I guess he had two. But I understand before Tower went on the boat, he had a six-pack and he had drunk some vodka as well. They found that in his car. So he had substantial alcohol in his system. And then the ‑‑ I believe the court of appeal may have made a mistake in the law. They said wherever you have ‑‑ wherever facts are consistent with guilt or innocence, they're saying it's okay, as long as it's consistent with guilt, it's okay to find him guilty, whereas under Federal law, under U.S. v. Bautista Avalet says no, if facts are explainable either guilt or innocence, it's the prosecution's duty to find that it's guilty beyond a reasonable doubt. It's not ‑‑ it's innocent ‑‑ not innocent beyond a reasonable doubt. Okay. That's U.S. v. Bautista. Okay. Thank you so much. Thank you, Mr. Young. You'll have three minutes when you come back. Good afternoon. Yes. May it please the Court, Lilia Garcia, Supervising Deputy Attorney General on behalf of a Pelley respondent for the warden. The question before this Court is whether the California court of appeal properly applied the Jackson standard in reaching its conclusion that there was sufficient evidence of implied malice to support a second degree murder conviction. Ms. Garcia, may I interrupt you for just a second? Certainly. At page 26 of the court of appeals decision, 2001. Yes. The court says most damaging is the evidence of consciousness of guilt, including Gessie's admitted lie to police during the 1997 interview. Your brief, supplemental brief, page 11, says that evidence referring to the California court of appeal included Gessie's lie to police during the 1997 interview. So I think that you agree with the court of appeal that there was a deliberate lie. Could you please explain to me what the particulars of that deliberate lie were in your mind? Yes. Well, he changed a couple of things. In the 1997 interview, he indicated that the length of where the location of the struggle occurred was one and a quarter lengths from the pier. In other words, he placed the location of the struggle and the boat closer to the pier in order for Mr. Gessie then to support his claim that the victim would have had a reasonable chance of reaching shore rather than being two to three pier lengths away, which he had initially stated in his 1991 initial interview. And then later in his trial testimony when cross-examined about the discrepancies regarding the location, he admitted he had lied to police in 1997 about where the boat was located. So your view is that in 1991, he said the boat was two or three pier lengths away from shore. Correct. And in 1997, he said it was one and a quarter lengths. How long is a pier length? A pier length I think is 19,000 feet. 19,000? 1900. Excuse me, 1900 feet. The prosecutor estimated that based on the two to three pier lengths, that he was anywhere from a mile to three quarters of a mile away from shore. So therefore, placing it at one pier length would place it under half a mile to shore. Let's say we agree that a jury could find that he told an untrue story to the police. Correct. Okay? How does that prove second-degree murder as opposed to manslaughter? Well, it isn't just the untrue story. Okay, well, let's start with just the untrue story. Would you agree with me then that the untrue story doesn't shed any light on whether it's manslaughter or second-degree murder? It shows a consciousness of some wrongdoing. Correct. But not necessarily one degree versus the other degree. That's correct because it's just one facet of all of the cumulative effect of the evidence. And the next thing you have is what, the shoulder? Well, I think viewing it the way that the jury viewed it, the trier of fact viewed it, they had two factors to consider. One, the defendant's failure to report the incident after it occurred. Okay, and how is that inconsistent with manslaughter? Well, it's inconsistent with manslaughter because we don't have any provocation by the victim, in this case, towards the defendant. Well, we don't know what happened because there were only two people there, and the only one whose version is in front of us is the defendant's. Well, that's not actually true. We do have other evidence to suggest. How many people were on the boat? There were only two people. And one is dead. Correct. The other one is the defendant. Yes. He said there was a fight. Correct. Now, how do you refute that? Well, his own statements. In 1997, he stated, his initial statements in 1981, Mr. Gessie's statements were, I was sitting on the boat just fishing away after six hours of being with this victim on the sea, having a great old time, making plans to come back the next day, when all of a sudden after it's dark, he attacked me for no reason. It must have been drugs. Okay. We find out, of course, the autopsy shows absolutely no evidence of drugs. It shows alcohol. It shows alcohol. And as a course of the struggle, they ended up in the water, and that the defendant tried to drown him while he was, excuse me, the victim. Scott Tower tried to drown Mr. Gessie while they were in the water. However, in 1997, his story changed completely. My first question was, okay, I agree with you. We have evidence that he falsified, that a jury could find that he gave a false statement. I don't see how that negates second-degree murder versus manslaughter. Well, I think we have to look at all the evidence. Cumulatively, that is only one. Okay, then we're going in circles. And I said, okay, then that brings us to the shoulder. That was your other big evidence, right? Well, that's part of the evidence. We know that it wasn't an accident because from Mr. Gessie's own statements, it wasn't an accident that he went off the boat. In other words, he wasn't standing on the boat, and all of a sudden he's so drunk he falls off the boat. Gessie's version is they had some kind of altercation, and he jumped into the water. Yes. Now, you say that's not true. No. I say that Mr. Gessie made enough different statements, three different statements regarding the version of events, that the jury could have reasonably rejected those statements and found and relied on his most recent statement to his brother that Mr. Gessie was the aggressor. Mr. Gessie told his brother immediately after the event in his first or second phone call, I hit him so hard that I didn't think he was going to get up. That's after the fight started. Yes. Okay, well, then that takes me back again. How do you know they didn't have a fight? No, we do suspect it was a fight. How do you know, then, that this fight wasn't a sudden provocation? Well, we don't know that the initial fight wasn't. We don't. But we do know one thing from Mr. Gessie's statement, that by the time that Mr. Gessie has subdued him, because he's already struck him, he's got him under control, he says that in his 1997 interview, I had him under control. He also tells the police, the victim didn't threaten me with a gaff. He didn't threaten me with a speargun. He didn't threaten me at all. Okay, so there's no self-defense. At that point, no. How do you know he didn't throw him off the boat on purpose as a result of a sudden provocation? Threw who off the boat? Mr. Gessie threw the victim off the boat? Yeah, that's your theory. We don't know that. If you don't know that, then how did you prove it? No, we're not saying he didn't. The evidence that was presented to the jury is this. We don't know that the defendant actually physically threw him off the boat. Okay. But we do know one thing. We know that Mr. Tower did not leave by accident, and we also know that he didn't voluntarily leave. And the reason we know he didn't voluntarily leave is because he could not swim that distance to shore. He had a separated clavicle from his navel. Well, that's not exactly true either. He never testified. There's no evidence. Conspicuously missing from this record is any evidence that Tower told people, I can't swim. Isn't that true? That's true, but we have a medical expert, his own doctor, who did the surgery. Well, what he said was, in my opinion, he might be able to do a certain kind of stroke, but not an overhand stroke. That is correct. He did say that. We also know that he was not wearing his sling anymore. Isn't that true? Yes. And we know that he was drinking, right? Correct. And we know that he was seen earlier in the day carrying two six-packs of beer. Correct. Well, why isn't it entirely reasonable that since he's not going around telling people, I can't swim, and if he's drinking or drunk and he's not wearing his sling, then maybe he overestimated his shoulder problem. Well, it's unreasonable to find that conclusion because the expert, he was asked, the doctor was asked, would it be possible in Mr. Tower's condition, because he was scheduled to have surgery that following week because the first surgery had been unsuccessful. His surgery had been December 26th. This occurred February 7th. The doctor said no, it's highly unlikely that he would have been able to swim a mile to shore in the dark, in the cold water, in his inebriated state. Well, the question is not whether he could do it. The question is whether he knew he couldn't do it. You don't have anything where he says, gee, I'm in too much pain, I can't swim anymore, anything like that? No. But I think a jury can reasonably draw an inference that a person would not ordinarily jump into the water with an injury that would preclude them from swimming any long distances. Besides the shoulder injury, we have Gessie's statement to his brother that he beat the victim. Gessie was the aggressor in this case. We don't know how the fight started. We don't. Were there any injuries on Tower, any fight injuries? By the time that the body was found, which was 12 days after the incident, the body was so badly decomposed that the I think you're leading up to a no, is that right? There were no injuries on Tower's body that the examiners found. No, because they couldn't determine in light of the decomposition of the body. Then there's no proof. For whatever reason, there's no proof. We don't know that there hadn't been, but we do know there were injuries on Mr. Gessie. Well, there is the brother's statement from Geese that he's knocked him down and Geese didn't let him get up. That's correct. And he knocked him down so hard that I didn't think he was going to get up. And what's particularly significant about that statement is that Gessie told the police in 1997, I had the situation under control. I was yelling my rear end at him and I was basically intimidating him. You have the way Mr. Gessie portrayed the situation to the police in 1997 was that he had Mr. Tower under control, that he didn't fear, he actually said, I didn't fear him, I wasn't afraid of him. Okay, so why would Mr. Tower then jump off the boat? It had to be either as a result of physical force or physical intimidation, excuse me, threat of life. In other words, a person in that condition has to fear for his life more to jump into the cold water and swim a distance, a mile to shore. It's like being in a burning building. You're on the seventh floor and you're deciding if I stay, I'm going to get burned. If I jump, I may get killed. And that's a predicament that Mr. Tower found himself in, in that boat alone with Mr. Gessie, at night on September and February the 7th, 1990, 1991. Okay. The court of appeal relied not only on the failure to report. It's very significant also, I think, of the malice and the knowing awareness of the dangerousness of the situation that Mr. Gessie in 1998 sustained. I saw him when he jumped. Is it your theory that regardless how Tower got in the water, if he was in the water and he yelled for help, and instead of helping him, the defendant, Gessie, did two things. One, threw the cans and whatever effects Tower had on the boat over, and then calmly motored away. Would that be second-degree murder? Yes. And I think the court anticipated my next statement. That's exactly where I was going. The failure to attempt a serious rescue attempt on either two theories. One, the theory that the court has just expressed, that he threw away everything that belonged to Mr. Tower to get rid of any evidence that this victim had been on his boat, and then motored away out to open sea. Or two, based on Mr. Gessie's trial testimony, which was under penalty of perjury, that he stated after Mr. Tower jumped in the water, I saw his head bobbing in the water, and I called back to him and told him, you don't have to leave. But when questioned by the prosecutor, Mr. Gessie admitted he had eight preservers in his lifeboat, in his boat, excuse me, and didn't throw him one. And when pressed by the prosecutor, why didn't you throw him a life preserver? Basically, he couldn't come up with an answer other than he was angry at Tower. Okay. What case, what California case, it's under California law, what California case says that it's murder if you don't rescue somebody? Well, no, it's not. There's no such case that says if you don't rescue them. This is not that case, though. The case is that we have Mr. Gessie creating the situation. He invited Tower on his boat. He took him out to sea. And then a struggle or a fight occurred while they were out. And in that process, as a result of whatever happened on that boat, Mr. Tower was forced out of the boat. And when he yelled for help, Mr. Gessie failed to do any serious attempts to rescue him, and he also failed to report the incident at the most earliest convenience. So even assuming, since neither of us were there, and there's only one person alive who was there, even assuming if your surmise is correct, I don't see how that shows second-degree murder as opposed to manslaughter. Well, there's no provocation, though. How do you know that? Well, we know that from Mr. Gessie's own statement where he says, I hit this man so hard I didn't think he was going to get up. In other words, even if there had been provocation initially, it was over. Well, I mean, how do you know what started it or where it went? We don't know where it started, but he did say that he was in control of the situation. He told the police in 1997, I was in control of the situation. In his testimony in 1998, he says, well, we have evidence that he had told his brother that he had hit him so hard he wasn't going to get up. And in 1998 in his trial testimony, he also says, yes, I was yelling at him. He was in control of the situation. Even if there had been a provocation by the victim, he started it. The danger was over. The law says that once the danger is over, you don't have a right to continue to be using aggressive, violent force against somebody when there is no risk of danger to you. At that point, Mr. Gessie didn't fear. And he stated that. He did not fear the victim. Okay. So then we know he's got the situation under control. What happened then that the victim decided to jump off? And the prosecution and the evidence established that it was an accident and it wasn't a suicide attempt. There's only one other reasonable interpretation. He was physically forced off or he left because he feared for his own safety. Or he was so drunk he made a bad decision to jump into the water. Well, the fact that he may have been drunk is a factor. But the fear instilled in him because Gessie testified that Scott Tower was fearful and afraid of him. Okay. Thank you, Ms. Garcia. Mr. Young, you've got, I think, three minutes left. Just a few remarks with respect to comments made. I'm sorry. I can't hear you, sir. Just a few remarks with respect to comments made by the Attorney General. I understand the doctor, Tower's doctor did testify that Mr. Tower could have made it back to shore swimming. It wasn't absolutely certain that he would not have made it. But, again, the real issue is what was in Tower's mind. The Attorney General also said that there was no evidence of who started the fight. We don't know. But I think we do know. Mr. Gessie said that the fight was started by Mr. Tower, who attacked him and forced him in the water. And there's been no evidence at all contrary to that. And there was no disputing testimony or inconsistent testimony with respect to that fact. I do also understand that Mr. Tower was on probation at the time for other crimes he had committed. He had quite a long rap sheet. And possibly he jumped in the water because he was concerned that if he went back with Mr. Gessie, he might be turned in. The failure to rescue Mr. Gessie. Why would he be turned in? Mr. Gessie could have turned him in for assaulting him, trying to drive his boat away, steal his boat. That's piracy, when Mr. Gessie was still in the water. Mr. Tower attempted to leave Mr. Gessie in the water and drive away in the boat. That's why Mr. Gessie was so concerned about it, his own safety. It's just that Mr. Tower couldn't start the boat because it was in gear and you can only start the boat when it's not in gear. And that's the only reason Mr. Gessie is alive today. Otherwise, Mr. Gessie would be dead and Mr. Tower would be the one. We'd be talking about Mr. Tower right now. There's no evidence that Mr. Gessie did anything after the situation got taken into control. All we know is that Mr. Gessie's testimony said, at the interviews with the police and at trial, that he did not strike Mr. Tower after they got back on the boat. Now, there's evidence that Mr. Gessie's brother said that he did say that, but whether he did or not, the point was they were still on the boat when Mr. Gessie said, I got everything under control. It was after that that Mr. Tower left. Why did Mr. Tower leave? Maybe, again, maybe it was because of the probation matter. Maybe it was because he was so drunk he wanted to make it back to shore. He didn't know what he was doing. He was drunk out of his mind. So those are the explanations as to that. Just one last comment with respect to the court of appeals decision that in support of their argument regarding the sexual assault, they made a comment that Mr. Tower's shirt was off. Well, in fact, they also said that Mr. Gessie would not have known and didn't know that Mr. Tower had a shoulder injury. Had Mr. Tower's shirt been off in the boat, Mr. Gessie could have seen the sutures because in the court of appeals decision, they said that Mr. Tower had sutures in his elbow or in his shoulder, I should say, and Mr. Gessie would have known that. So the court of appeals saying Mr. Gessie did not know of that injury tells you that Mr. Tower took his shirt off in the water and not before. So that is not evidence that there was a sexual assault. I'm out of time. Thank you very much, Mr. Young. Ms. Garcia, thank you, too, very much. The case just argued is submitted. We'll stand and recess.
judges: Noonan, Silverman, Bea